**UNITED STATES of America**

v.

**Robert G. BAKER.**

**Cr. No. 39-66.**

United States District Court
District of Columbia.

May 22, 1969.

See also D.C., 301 F.Supp. 977.

William O. Bittman, Washington, D. C., for the United States.

Edward Bennett Williams, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GASCH, District Judge.

This case was remanded for further hearings on the defendant's motion to suppress fruits of concededly illegal eavesdropping devices. The remand deals with two separate aspects of the motion to suppress.

First, the Court of Appeals held that the defendant was entitled to inspect the records of all conversations intercepted through the device in the suite of Fred Black in the Sheraton Carlton Hotel in Washington, D. C. At the pretrial hearing, the defendant had received those logs reflecting his own conversations and those of unknown conversants. The Court of Appeals also permitted the defendant to examine those logs from the devices placed in the offices of Benjamin Sigelbaum in Miami, Florida, and Edward Levinson in Las Vegas, Nevada, which reported conversations with unknown conversants. All such logs have been provided to the defendant.

Second, the Court of Appeals remanded for further consideration the question of whether the monitoring of the telephone call from Baker to Levinson reported in the Las Vegas log on November 1, 1962, tainted the cross-examination of the defendant as to his whereabouts on the weekend of November 2, 1962. If any taint were found, this Court was directed to determine whether it was prejudicial.

This Court held an evidentiary hearing during the week of December 16, 1968. Pursuant to defendant's motion, further testimony was adduced on April 16, 1969. Based on the opinion remanding the case, the record and the hearings held pursuant to the remand, the Court enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. During the relevant period, the Grand Jury investigation concerning the Baker case was in the charge of three Department of Justice attorneys: William O. Bittman, Donald Page Moore, and Austin Mittler. The trial was conducted by Messrs. Bittman and Mittler. Two Internal Revenue Special Agents were assigned to the Baker case in the Fall of 1963: Joseph Rosetti and Donald Iverson; they remained on the case through the trial. The Federal Bureau of Investigation opened its case on October 3, 1963. The case agent in the Washington Field Office from that time until January, 1966, was Paul Kenneth Brown. Agent Brown made investigations as requested by the Department of Justice. These requests were normally in writing.

2. Mr. Bittman was not informed that the defendant's conversations had been picked up by eavesdropping devices until September or October of 1965. The information was supplied as the result of a written inquiry motivated in part by defendant's revelation of the Levinson eavesdropping device before the Senate Rules Committee.

3. The FBI informed Mr. Bittman of the Black, Levinson, and Sigelbaum devices and showed him the basic logs on these devices at FBI Headquarters. He did not make copies or notes. He did not review his Department of Justice files when he returned to his office, and he has no recollection of ever having seen any of the illegally obtained conversations in his prosecution files.

4. Prior to this remand hearing, the defendant had an opportunity to examine all the records of conversations from the Edward Levinson and Benjamin Sigelbaum surveillances in which one of the participants was unidentified.

5. The defendant, in pleadings filed prior to this hearing, selected from these materials four conversations monitored during the course of the Sigelbaum surveillance (on April 18, 1963, February 14 and 19, 1964, and May 20, 1965) and two conversations monitored during the course of the Levinson surveillance (on November 9, 1962, and December 10, 1962) as conversations in which he, the defendant, was the unidentified participant.

6. At the remand hearing the defendant testified that:

(a) He was not the unidentified person in the April 18, 1963, Sigelbaum log, and he was not the unidentified party in the November 9, 1962, Levinson log.

(b) He was the unidentified person in the May 20, 1965, Sigelbaum log.

(c) He might have been the unidentified person in the remaining conversations which he had selected prior to the hearing.

7. With respect to the conversations reflected in 6(b) and 6(c) above, the defendant failed to show at the evidentiary hearing that any of the information contained in those conversations led, directly or indirectly, to any evidence used by the Government at the trial of this case.

8. Prior to this hearing, the defendant had an opportunity to examine all the records of conversations overheard by the FBI during the electronic surveillance of the Sheraton Carlton Hotel suite of Fred Black, Jr.

9. The defendant in pleadings filed prior to the hearing selected from these records eight items which he alleged had some relevance to the trial of the instant case. At the hearing itself, defense counsel was able to indicate only that the names of Edward Bostick and Melpar, Inc., and their relationship to each other, appeared in these records and the same Edward Bostick was a witness called by the Government at the trial of this case.

10. The defendant has made no showing that the items which mention Bostick and Melpar led, directly or indirectly, to the evidence used by the Government at trial.

11. The Baker ·case files at FBI Headquarters contain no information whatever pertaining to either Bostick or

Melpar which emanated from the Black surveillance.

12. The Baker case files of the Washington Field Office of the FBI contain one item relating to Bostick and one item mentioning Melpar, Inc., which did emanate from the Black surveillance. However, neither relates to any of the evidence used by the Government at trial. They were neither made the basis of any investigation or investigative leads in the Baker case, nor disseminated outside the Washington Field Office of the FBI.

13. Both Edward Bostick and Melpar, Inc., first became known to Paul Kenneth Brown, the FBI Baker case agent, on October 3, 1963, during his interview of Ralph Hill—the first interview conducted by the FBI in this case. His interview of Hill was conducted at the specific request of the Criminal Division of the Department of Justice a week prior to the receipt of items from the Black surveillance which mentioned Bostick and Melpar, Inc.

14. Edward Bostick's trial testimony —which included testimony about Melpar —was based upon testimony which he had given in 1964 before the Senate Rules Committee in the course of their hearings into the Baker matter. The content of Bostick's trial testimony conforms in all material respects to his Senate Rules Committee testimony.

## II.

A. *Cross-Examination of Robert G. Baker re November 2, 1962*

15. The Government's chief prosecutor, William O. Bittman, first saw the original log containing the November 1, 1962, overhearing sometime in September, 1965, at the FBI office in Washington, D. C. The FBI had picked up defendant's voice in connection with organized crime investigations.

16. Assistant Government prosecutor Austin S. Mittler first saw the original log containing the November 1, 1962, overhearing by the FBI sometime during 1966 after a motion to suppress had been filed by the defendant.

17. Prior to the hearing on the defendant's motion to suppress, a verbatim copy of the November 1, 1962, log was made available to defense counsel and the Court. During the hearing held in November, 1966, in connection with the defendant's motion to suppress, the conversation of November 1, 1962, became the subject of testimony.

18. The Government first learned on Thursday, January 19, 1967, when defense counsel, Mr. Williams, made his opening statement, that Mr. Baker's defense would, in part, be that he was in Los Angeles, California, on the weekend of November 2, 3, and 4 of 1962; that he returned to Washington, D. C., on November 4; and that on the morning of November 5 he gave to Senator Kerr an envelope containing $16,200.

19. Government counsel then began to review his files to check the authenticity of this representation. On Friday, January 20, 1967, Government counsel, Austin Mittler, found an FBI report which disclosed the existence of a folio card for the defendant at the Beverly Hills Hotel in Los Angeles, California, for November 4, 1962.

20. Government counsel then found the original folio card of the Beverly Hills Hotel in the Government's Documents file.

21. This card indicated on its face that the defendant checked out of the Beverly Hills Hotel in Los Angeles, California, at 8:06 P.M. on November 4, 1962. Defendant could not have been in Washington, D. C., on that date.

22. Neither the FBI report which disclosed the existence of the folio card for the Beverly Hills Hotel nor the folio card of November 4, 1962 (Gov't Ex. 1-A) is tainted. No motion was made at trial to strike that part of the cross-examination which related to Mr. Baker's presence in Los Angeles, California, on November 4, 1962. These documents were obtained routinely by the Government in 1965 during the course of its Grand Jury investigation in this case.

23. After seeing the folio card, Mr. Bittman, chief Government counsel, asked Mr. Mittler to see if he could determine the defendant's whereabouts prior to November 4—specifically on November 2 and November 3.

24. Later that evening, Mr. Mittler found a schedule of telephone calls made by the defendant which reflected that Mr. Baker had made two telephone calls on November 2, 1962, from Las Vegas, Nevada. The telephone schedule had been compiled from untainted sources by the FBI in 1965 as a part of the Grand Jury investigation in this case.

25. Mr. Mittler showed the November 2 telephone calls to Mr. Bittman, who then requested that someone contact the Sands Hotel in Las Vegas to see whether the Sands had a registration card for Mr. Baker for that date.

26. Mr. Bittman specifically requested the Sands Hotel record because:

(a) The Government had previously obtained hotel records from the Sands which indicated that Mr. Baker had stayed there in April, 1963. These records were untainted, having been obtained routinely during the Grand Jury investigation in this case. In fact, one such record was stipulated into evidence at the trial of this case.

(b) He previously had beeen told by Wayne Bromley that Baker usually stayed at the Sands Hotel when in Las Vegas, Nevada.

27. That evening, Friday, January 20, 1967, Donald Iverson requested that an Internal Revenue Service agent in Las Vegas, Nevada, go to see whether the Sands Hotel had a registration card for Mr. Baker.

28. Later that evening, Mr. Iverson received a return call from Las Vegas, Nevada, and was told that a record had been found for Mr. Baker at the Sands Hotel in Las Vegas for November 2–4, 1962.

29. Thereafter, Mr. Iverson received a microfilm copy of that record.

30. This exhibit (Gov't Ex. 3) and the Beverly Hills folio card together formed the basis of the cross-examination of Mr. Baker during the trial as to his whereabouts over the weekend of November 2–November 4, 1962. This evidence was untainted.

### CONCLUSIONS OF LAW

■ Upon consideration of the additional evidence adduced as a result of the remand and the findings heretofore made, the Court concludes:

1. That the Government has established by clear and convincing evidence and beyond a reasonable doubt that it had an independent source for its trial evidence relating to Bostick and Melpar, Inc.;

2. That none of the other conversations revealed by the remand have any relevance to the charges in this indictment; and

3. That none of the items used in the cross-examination of the defendant respecting his Las Vegas trip were tainted. The Government has established by clear and convincing evidence beyond a reasonable doubt that it had an independent source.

■ The Court's finding that the Government had an independent source makes it unnecessary to deal with the alternate question of whether, assuming the evidence should have been excluded, the corrective instruction was sufficient to cure any potential prejudice. Nevertheless, the Court has considered this issue and concludes that:

(a) The defendant when confronted with evidence that he was in Las Vegas on November 2–4, 1962, rather than in Los Angeles as he had testified on direct, said without hesitancy: "It is entirely possible" and when asked whether he did any gambling responded, "I am sure that I might have. People normally do." Defendant was an unruffled and confident witness. It was brought out that defendant made many trips across the country. It is only about a forty-minute flight from Los Angeles to Las Vegas and that he probably went to Las Vegas from Los Angeles.

(b) The Court granted defendant's motion to strike out of an abundance of caution and to give the defendant the benefit of whatever doubt existed at that time and prior to this evidentiary hearing.

(c) When this brief segment of the trial (the transcript of the testimony is about a page or two out of a total transcript of 3,399 pages) is considered in its proper perspective, the Court finds defendant could not have been prejudiced by it, for beyond a reasonable doubt it was harmless.